UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
TOWN OF HEMPSTEAD,

                        Plaintiff,

      -against-

UNITED STATES OF AMERICA, DEPARTMENT OF THE
NAVY, NORTHROP GRUMMAN CORPORATION,
NORTHROP GRUMMAN SYSTEMS CORPORATION,
COVESTRO LLC, BAYER CORPORATION,
OCCIDENTAL CHEMICAL CORPORATION,
THE KASPER (1977) IRREVOCABLE TRUSTS
FOR THE BENEFIT OF CHARLES B. KASPER
AND RICHARD J. KASPER; SANDERINA R.
KASPER, as Trustee of the Kasper (1977)
Irrevocable Trusts for the Benefit of
Charles B. Kasper and Richard J. Kasper;
MARTIN STALLER, PARVIZ NEZAMI, JEROME COGAN,
LAWRENCE COHEN and AMERICAN DRIVE- IN
CLEANERS OF BETHPAGE, INC.,

                        Defendants.
------------------------------------------------------------------------X

**COMPLAINT**

Civil Action No.

      Plaintiff, the Town of Hempstead (the "Town" or "Plaintiff"), by its attorneys, Jaspan Schlesinger LLP, complaining of the defendants, United States of America ("United States") and the Department of the Navy ("Navy"), Northrop Grumman Corportion, the Northrop Grumman Systems Corporation (collectively "Northrop Grumman"), Covestro LLC ("Covestro"), Bayer Corporation ("Bayer"), Occidental Chemical Corporation ("Occidental"), the Kasper (1977) Irrevocable Trusts for the Benefit of Charles B. Kasper and Richard J. Kasper, Sanderina R. Kasper, as Trustee of the Kasper (1977) Irrevocable Trusts for the Benefit of Charles B. Kasper and Richard J. Kasper (the "Kasper Trust"), Martin Staller ("Staller"), Parviz Nezami ("Nezami"), Jerome Cogan ("Cogan"), Lawrence Cohen ("Cohen") and American Drive-In

Cleaners of Bethpage, Inc. ("American Drive-In") (collectively, "Defendants"), alleges as follows:

### Nature of the Action

1. This is an action brought pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 *et seq.* ("CERCLA") and New York State Common Law. Plaintiff seeks recovery against the Defendants, in their capacities as current or prior owners and/or operators, of response costs incurred and to be incurred in connection with the disposal and release of hazardous substance(s) by Defendants.

2. The disposal and release of hazardous substance(s) occurred at or from the Naval Weapons Industrial Reserve Plant, located on approximately 105 acres in Bethpage, New York in east-central Nassau County near the intersection of South Oyster Bay Road and the Long Island Railroad tracks ("NWIRP Site"). The NWIRP Site was owned and operated by the Navy, Northrop Grumman and/or their predecessors in interest. The NWIRP Site is contiguous to approximately 500 acres of property also located in Bethpage, New York that is owned and operated, or formerly owned and operated by Northrop Grumman and/or its predecessors in interest (the "Northrop Grumman Site"). The disposal and release of hazardous substance(s) at the NWIRP Site and the Northrop Grumman Site (collectively, the "NWIRP/Northrop Grumman Site") during the period of time the Navy and Northrop Grumman owned the NWIRP/Northrop Grumman Site caused ground water contamination which threatens public water supply wells owned and operated by Plaintiff.

3. In addition, disposal and release of hazardous substances from Hooker/Ruco Superfund Site located in Hicksville, New York (the "Hooker/Ruco Site") caused ground

2

water contamination which has comingled with the downgradient groundwater contamination emanating from the NWIRP/Northrop Grumman Site and thus the owners and operators of the Hooker/Ruco site are or may also be liable to Plaintiff.

4. Finally, downgradient contamination of the groundwater emanating from the American Drive-In Superfund site located at 3801 Hempstead Turnpike, Levittown, also contain hazardous substances which have threatened the public water supply and the past and present owners and operators of the property, upon which a dry cleaning business which disposed of hazardous substances was located (the "American Drive-In Site)(collectively, with the NWIRP/Northrop Grumman Site and the Hooker/Ruco Site, the "Sites"), are or may also be liable to Plaintiff.

**Jurisdiction and Venue**

5. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §§ 9607(a) and 9613(b).

3. The Court has authority to issue a declaratory judgment concerning the rights and liabilities of the parties pursuant to 42 U.S.C. § 9613(b).

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 42 U.S.C.§ 9613(b) because the Sites are located in this District, the disposal and release of the hazardous substances occurred in this District, and the damages occurred in this District. In addition, the Defendants conduct and/or have conducted business in this District.

**The Parties**

5. Plaintiff is a "person," as that term is defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21), that has incurred and continues to incur necessary costs of "response," as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

3

6. Plaintiff is a municipal corporation located at One Washington Street, Hempstead, New York. Plaintiff operates, through the Town Water Department, the Levittown Water District ("LWD") which provides potable water to customers located within its district.

7. The Navy, which is a department and/or agency of the United States, previously owned and/or operated the NWIRP Site.

8. Defendant Northrop Grumman Corporation ("NGC") is a Delaware corporation with its principal place of business at 2980 Fairview Park Drive, in Falls Church, Virginia. Upon information and belief, NGC is a successor in interest to Grumman Corporation.

9. Defendant Northrop Grumman Systems Corporation ("NGSC"), formerly known as Northrop Grumman Corporation, is a Delaware corporation with its principal place of business at 2980 Fairview Park Drive, in Falls Church, Virginia. Upon information and belief, NGSC is a subsidiary of NGC, and is a successor in interest to Grumman Aerospace Corporation, which was headquartered in Bethpage, New York and incorporated under the laws of the State of New York.

10. Northrop Grumman previously owned and/or operated the NWIRP/Northrop Grumman Site.

11. Defendant Covestro, formerly known as Bayer MaterialScience LLC is, upon information and belief, a Delaware Limited Liability Company authorized to do business in New York with a principal place of business at 1 Covestro Circle, Pittsburgh PA, 15205.

12. Covestro is, upon information and belief the current owner/operator of the Hooker/Ruco Site.

13. Defendant Bayer is, upon information and belief, an Indiana Corporation authorized to do business in New York with a principal place of business at 100 Bayer Road, Bldg 4, Pittsburgh, Pennsylvania 15205.

14. Bayer is the successor by merger to Ruco Polymer Corporation and is a prior owner/operator of the Hooker/Ruco Site.

15. Defendant Occidental is a corporation incorporated pursuant to the laws of the State of New York with a principal place of business located at 5005 LBJ Freeway, Dallas, Texas, 75244.

16. Occidental is the successor in interest to Hooker Chemical and Plastics Corporation the former owner/operator of the Hooker/Ruco site.

17. Upon information and belief, the Kasper Trust was formed pursuant to the laws of the State of New York on or about June 30, 1983 by Benjamin P. Kasper as settlor for the benefit of Charles B. Kasper and Richard J. Kasper. Sanderina R. Kasper is the trustee of the Kasper Trust, and resides, upon information and belief, in St. James, New York.

18. Defendant Staller is an individual who resides, upon information and belief, in Chittenango, New York 13037.

19. Defendant Nezami is an individual who resides, upon information and belief, in Merrick, New York 11566.

20. Cohen is, upon information and belief, an individual residing in the State of New York.

21. Cogan is, upon information and belief, an individual residing in the Kings Park, New York.

22. American Drive-in is, upon information and belief, a corporation formed pursuant to the laws of the State of New York.

23. The Kasper Trust and Staller are the current and past owners of the American Drive-In Site. Staller, and subsequently the Kasper Trust, or its predecessors in interest, have owned the American Drive-In Site continuously since 1976.

24. Cohen, Cogan and Nezami, through American Drive-In, or now dissolved corporations, actively managed the day-to-day operations of the dry cleaning business during the time period when a VOC, PEC, was used and disposed of at the American Drive-In Site.

25. Each of the Defendants is a "person," as that term is defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

## Factual Background

### The Levittown Water District

26. The LWD serves a primarily residential area of approximately 3.9 square miles and approximately 50,000 residents. The LWD maintains 15 public water supply wells, nine of which are currently in service, including wells 7A, 8A and 13 (the "Wells"). The LWD draws its water supply from the Magothy Aquifer.

27. The primary working components of the LWD water supply system currently consist of the nine wells which are located at six stations, two elevated storage tanks capable of storing a total of 2.5 million gallons and a strong distribution system with major 10-inch and 12-inch loops. The LWD has five interconnections with neighboring water systems including one with Hicksville Water District, three with Bethpage Water District and one with East Meadow Water District. Four wells and four booster pumps are equipped with

6

standby generators and two wells are equipped with auxillary engines and right angle drives.

28. The average daily pumpage for the District in 2012 was approximately 4.85 million gallons per day (mgd) and the maximum day pumpage recorded in July 13, 2012 was approximately 11.11 mgd (7,715 gallons per minute).

29. It is essential that all of the system wells be available in order to reliably meet demands such as maximum day, maximum hour, maximum day plus fire flow, a consecutive series of high demand days and average day demand during a power outage.

**The Navy and Northrop Grumman's Operations and History of Contamination and Remediation Agreements**

30. From approximately 1942 to 1998, the Navy and Northrup Grumman owned and/or operated the NWIRP Site and from 1933 to 1998 Northrup Grumman owned and operated the Northrup Grumman Site and certain volatile organic compounds ("VOCs") were disposed of and/or released at the Site during that time periods. The VOCs disposed of and/or released at the Site are "hazardous substances" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

31. The Northrop Grumman Site is located 2 to 2.5 miles north-northeast of LDW Wells 7A, 8A and 13. The Hooker/Ruco Site is located immediately adjacent to the Northrop/Grumman Site to the west.

32. In 2003 a Public Water Supply Contingency Plan ("PWSCP") was prepared on behalf of the Navy pursuant to the March 2001 Record of Decision ("ROD") issued by the New York State Department of Environmental Conservation ("DEC") and the April of 2003 ROD issued by the Navy with respect to the treatment of the contaminated groundwater plume emanating from the NWIRP/Northrop Grumman Site, which is known as Operable Unit 2 ("OU-2").

7

33. In or about 2005, the Navy and the DEC entered into an agreement pursuant to which the Navy, in conjunction with Northrop Grumman, agreed to investigate and, if necessary, remediate the VOCs released at the NWIRP Site substantially as set forth in the PWSCP. Upon information and belief the required investigation and remediation activities were carried out by the Navy in conjunction with Northrop Grumman.

34. As part of the agreement with the DEC, the Navy was required to periodically sample certain outpost groundwater monitoring wells located hydraulically upgradient of the LWD's wells and, if contaminant levels were determined to exceed predetermined trigger values, the Navy committed to provide the wellhead treatment or comparable alternative measures to protect the public water supply.

35. In July of 2005, Northrop Grumman signed a Remedial Investigation and Feasibility Study Order on Consent for the Former Grumman Settling Ponds, Adjacent Areas of the Bethpage Community Park, and the Grumman Access Road, collectively known as OU-3. These areas were historically used by Northrop Grumman to dispose of hazardous waste generated by the Northrop Grumman operations. Pursuant to investigations conducted by Northrop Grumman under the supervision of the DEC the plume of contaminated groundwater emanating from OU-3 has intermingled with the OU-2 plume.

36. The combined plume was believed by the ground water flow models relied upon by Northrop Grumman and the Navy to be traveling in a south - south- easterly direction.

37. In July of 2013 samples collected from the outpost groundwater monitoring wells detected VOCs in excess of the trigger values released at and migrating from the NWIRP Site that will contaminate the LWD Plant No. 13.

38. Well 13, which is 741 feet deep, and screened in the Magothy aquifer, has shown increasing levels of 1,1,2-Trichloro-1,2,2-Triflouroethane (Freon 113) in the past several years; in July of 2013 concentrations of Freon 113 neared the Maximum Contaminant Level (MCL) of 5.0 µg/l for this specific compound.

39. LWD Wells 7A and 8A were not included in the program to install outpost monitoring wells and consequently trigger values have not been established. However, samples collected from these wells indicate the presence of VOCs in increasing concentrations.

40. In particular, beginning in 2013, the water in Wells 7A and 8A exhibited trace concentrations of VOCs. Between the beginning of 2013 and August of 2014, the water has exhibited increasing levels of primarily three VOCs, 1,1 Dichloroethane (1,1 DCA) in Well 7A and 1,1,2-Trichloro-1,2,2-Triflouroethane (Freon 113) and Tetrachloroethene (PCE) in Well 8A. The concentrations of Freon 113 approached the maximum contaminant level (MCL) for these contaminants.

41. DCA, PCE and Freon 113 are all VOCs associated with the OU-2 plume.

42. In order for the LDW to continue to provide an adequate supply of water to the distribution system into the future, it is necessary to construct a treatment facility for removal of VOCs from this water source and Plaintiff retained a consulting engineer to prepare a Design Report for a packed tower aeration system to treat the contamination (the "Treatment System".

43. By letter sent via certified mail on April 24, 2015, Plaintiff, by its consulting engineer, provided the Navy and Northrop Grumman with copies of its reports showing the results of the testing and the Design Report and requested Plaintiff be compensated for the

cost of the design, construction and operation of the Treatment System.

44. By letter dated June 18, 2015 the Navy refused to provide the funding for the Treatment System, claiming there were possible sources of contamination and that the Navy's groundwater flow modeling had not predicted an impact on Well 13 within 30 years and had not predicted and impact on Wells 7A and 8A at all.

45. However, the groundwater flow model relied upon by Defendants has been found by a study prepared by the United States Geological Survey of the Department of Interior, in cooperation with the United States Department of Environmental Protection, to be in error such that it is of limited effectiveness in identification of sources of contamination, analysis of model accuracy, model calibration and simulations of future contamination scenarios.

46. Data presented to Plaintiff in May of 2016, which was characterized by the Navy and Northrop Grumman as preliminary in nature, demonstrated greatly increasing levels of contamination in contrast to what had previously been predicted.

47. Had the groundwater flow model been accurately prepared, it would have demonstrated that contamination from the OU-2 plume would have effected Wells 7A and 8A and would have predicted that contaminants would have impacted Well 13 sooner.

48. Based on the inaccurate groundwater flow data the Navy and Northrop Grumman have failed and refused to remediate contaminated groundwater impacting Plaintiff's Wells.

### The Hooker/Ruco Site

49. According to publicly available information, the Hooker/Ruco Site, adjacent to the NWIRP/Northrop Grumman Site located in an industrial park area of Hicksville, had

been used to manufacture plastics, latex, and esters since 1945. Liquid process wastes were discharged into sand sumps from 1951 to 1975. The sand sumps for Plant 2 manufactured polyvinyl chloride (PVCs) and latex, received approximately 2 million gallons of process wastewater per year from 1956 to 1975. Reportedly, the dry well for Plant 1, used for the manufacture of esters also received wasterwater. Some glycol wastes have been incinerated on site. Numerous leaks and spills of chemicals, including polychlorinated byiphenyls (PCBs), had occurred. Currently, all buildings located at the site have been demolished and the entire 14 acre site has been razed to ground level.

50. Groundwater underlying the site is contaminated with organic compounds such as vinyl chloride, trichloroethylene (TCE) perchloroethylene (PCE) and tentatively identified compounds (TICs).

51. While the best evidence demonstrates that the groundwater contamination impacting Plaintiff's Wells emanates from the NWIRP/Northrop Grumman Site, the United States Department of Environmental Protection ("EPA") and the DEC have determined that except for a distinct plume of vinyl chloride which is being treated by a treatment system known as biosparging, the remaining contaminated groundwater emanating from the Hooker/Ruco Site, comprised of the downgradient comingled plume, is commingled with the groundwater plume emanating from the NWIRP/Northrop Grumman Site which is impacting Plaintiff's wells.

## **The American Drive-In Cleaners**

52. The American Drive-In Site is approximately 0.37 acres in size and consists of a parcel of land located at 3801 Hempstead Turnpike, Levittown, Nassau County, New York (the "Property").

11

53. Upon information and belief, Defendant Staller owned the Property from on or about December 1976 through on or about April 1978 when it was transferred to a partnership known as Kastal Properties which was a partnership between Staller and Benjamin Kaspar. On or about October 11, 1979, Kastal Properties transferred title to the Property to Benjamin Kasper, who, in April 1, 1991, Benjamin Kasper transferred title to the Property to Defendant Kasper Trust.

54. Upon information and belief, the Kasper Trust remains the record owner of the Property.

55. The Property is currently vacant but previously contained an approximately 4,800 square foot masonry block structure within which, upon information and belief, from the mid-1950s through 2000, dry cleaning operations were conducted.

56. Upon information and belief, from October 1, 1977 through approximately February 28, 1983, the Property was leased to American Drive-In Cleaners of Bethpage, Inc., the shareholders of which were defendants Cogan and Cohen, both of whom actively operated the dry cleaning business on the Property.

57. Upon information and belief, beginning on March 1, 1983, the Property was leased to Interior Construction Management Inc. ("ICM"), a dissolved New York Corporation. Defendant Nezami was a 40% owner of ICM who thereafter, through December 2000, actively operated a dry cleaning business in a portion of the Property and subleased the remaining portions of the Property to various other businesses.

58. Upon information and belief, the solvent tetrachloroethylene, also known as perchloroethylene ("PCE") was used in the dry cleaning operations at the Property and the PCE was spilled and disposed of at the Property and in cesspools on the Property.

12

59. Upon information and belief, pursuant to a consent decree and settlement agreement with the DEC, Defendant Kasper Trust is responsible for the remediation of the contamination on and under the Property. In January 2001 the site was split into two operable units. The contamination of concern is the Operable Unit 2 which is the off-site groundwater PCE plume. Other contaminants include breakdown products of PCE, including TCE and DCE, all of which were found in concentrations above groundwater standards. PCE is currently impacting Well 8A.

**FIRST CLAIM FOR RELIEF**
(CERCLA Response Costs)

60. Plaintiff repeats and realleges each and every allegation contained the preceding paragraphs with the same force and effect as if fully set forth herein.

61. Upon information and belief, the Defendants were, at the time when hazardous substances were disposed of and/or released at the Sites, the "owner" and/or "operator" of the Sites within the meaning of Sections 101(20)(A) and 107(a)(2) of CERCLA, 42 U.S.C. §§ 9601(20)(A), 9607(a)(2).

62. The Sites are a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

63. The acts and/or omissions of Defendants with regard to the volatile organic compounds used at the Sites constituted a "release" and "disposal" of "hazardous substances" at or from the Sites within the meaning of Section 101(14) and (22) and 107(a)(2) of CERCLA, 42 U.S.C. §§ 9601(14) and (22), 9607(a)(2).

64. In response to Defendants' disposal and/or release of hazardous substances at the Sites, Plaintiff has incurred, and will continue to incur, monitoring and assessment costs in an effort to protect its water supply, and has incurred and will incur additional costs to

13

design, construct, install, maintain and operate treatment facilities adequate to address hazardous substances that emanate from the Sites.

65. The costs incurred by Plaintiff in connection with the Defendants' disposal and/or release of hazardous substances at and from the Site were necessary and reasonable and incurred in a manner consistent with the federal National Contingency Plan.

66. The Defendants are strictly liable, on a joint and several basis, as owners and/or operators of the Sites, under Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), for all costs incurred and to be incurred by plaintiff in response to the disposal and/or release of hazardous substances at and from the Sites.

**SECOND CLAIM FOR RELIEF**
**(Declaratory Relief)**

67. Plaintiff repeats and realleges each and every allegation contained the preceding paragraphs with the same force and effect as if fully set forth herein.

68. An actual, substantial legal controversy now exists between Plaintiff and Defendants, in that Plaintiff contends that Defendants are liable to Plaintiff for cost recovery under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for necessary response costs incurred and to be incurred, in connection with hazardous substances disposed of and/or released from the Sites. Upon information and belief, Defendants contest this liability.

69. A declaration of the rights and obligations of the parties pursuant to Section l13(g)(2), 42 U.S.C. § 9613(g)(2), that will be binding in any subsequent action or actions to recover all further response costs by Plaintiff, is appropriate and in the interests of justice in that an early determination of this controversy will avoid multiplicity of litigation and will provide assurance that Plaintiff will be reimbursed so that Plaintiff will be able to take appropriate response actions to continue to protect the public water supply.

14

### THIRD CLAIM FOR RELIEF
**Private and/or Public Nuisance**

70. Plaintiff repeats and realleges each and every allegation contained the preceding paragraphs with the same force and effect as if fully set forth herein.

71. Plaintiff is the owner of land, easements and water rights which permit it to extract groundwater for use in Plaintiff's Wells.

72. The negligent, reckless, and/or intentional activity of the Defendants, as alleged herein, has resulted in the contamination of Plaintiff's Wells and the groundwater that supplies them, giving rise to special damage to Plaintiff.

73. The negligent, reckless, and/or intentional activity of the Defendants, as alleged herein, accordingly, has interfered with Plaintiff's rights and property interests and its use and enjoyment of those rights and interests.

74. The negligent, reckless, and/or intentional activity of the Defendants, as alleged herein, has resulted in the contamination of the groundwater aquifer that supplies Plaintiff's wells, groundwater, drinking water supplies, and other waters.

75. The nuisance conditions caused, contributed to, maintained, assisted and/or participated in by the Defendants have caused substantial injury to Plaintiff's Wells and the groundwater that supply them, in which Plaintiff has a significant property interest.

76. The nuisance conditions caused, contributed to, maintained, assisted and/or participated in by the Defendants have substantially and unreasonably interfered with, obstructed and/or disturbed Plaintiff's rights to appropriate, use and enjoy groundwater from Plaintiff's Wells and continue to substantially and unreasonably interfere with, obstruct and/or disturb Plaintiff's rights to appropriate, use and enjoy groundwater from Plaintiff's Wells.

77. This contamination also interferes with the right of the community to safe drinking water.

78. Plaintiff is specially and adversely affected by the nuisance conditions alleged herein.

79. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff's Wells and the groundwater that supply them have been contaminated, causing Plaintiff significant injury and damage. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur, investigation, treatment, remediation and monitoring costs and expenses related to the contamination of its wells in an amount to be proved at trial.

### FOURTH CLAIM FOR RELIEF
#### Trespass

80. Plaintiff repeats and realleges each and every allegation contained the preceding paragraphs with the same force and effect as if fully set forth herein.

81. Plaintiff is the owner and actual possessor of Plaintiff's Wells.

82. Plaintiff owns, possesses and actively exercises its rights to appropriate and use groundwater drawn from Plaintiff's Wells.

83. Defendants negligently, recklessly and/or intentionally failed to properly control, apply, use and/or dispose of contaminants, such that Defendants proximately caused contaminants to enter, invade, intrude upon and injure Plaintiff's possession of property. Defendants engaged in affirmative conduct that caused, contributed to, maintained and/or assisted in the creation of the trespass alleged herein, as follows: Defendants knew, or should have known, that contaminants, including VOCs, such as Freon 113, TCE and PCE and others, were persistent, and could contaminate soil and groundwater.

16

84. Plaintiff has not consented to, and does not consent to, the contamination alleged herein. Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

85. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff's Wells and the groundwater that supplies them have been contaminated, causing Plaintiff significant injury and damage. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur, investigation, treatment, remediation and monitoring costs and expenses related to the contamination of Plaintiff's Wells in an amount to be proved at trial.

## FIFTH CLAIM FOR RELIEF
### Negligence

86. Plaintiff repeats and realleges each and every allegation contained the preceding paragraphs with the same force and effect as if fully set forth herein.

87. Defendants had a duty to use due care in the handling, control, use, and disposal of contaminants, including toxic and hazardous materials such as VOCs on the Site, and to prevent, and to the extent feasible, eliminate contamination of Plaintiff's Wells and groundwater supplying those wells with contaminants in concentrations which may endanger public health and/or exceed state and federal drinking water requirements.

88. Defendants so negligently, carelessly, and recklessly handled, controlled, and disposed of contaminants on the Sites that they directly and proximately caused contamination of Plaintiff's Wells and groundwater supplying those wells.

89. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff's Wells and the groundwater that supplies them have been, and continue to be, contaminated, causing Plaintiff significant injury and damage.

90. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur, investigation, treatment, remediation, and monitoring costs and expenses related to the contamination of its Wells in an amount to be proved at trial.

91. For the reasons set forth and specifically alleged above, Defendants acted maliciously, wantonly, recklessly and with conscious disregard of the known risks of injury to others, including Plaintiff. Plaintiff is entitled to an award of punitive damages against Defendants that is sufficient to punish the Defendants and that fairly reflects the aggravating circumstances alleged herein.

WHEREFORE, Plaintiff prays for judgment against the Defendants:

A. Awarding Plaintiff response costs incurred to date and to be incurred in the future, pursuant to CERCLA;

B. Declaring that the Defendants are liable to Plaintiff for the necessary environmental response costs incurred to date and to be incurred in the future in connection with the disposal and/or release of hazardous substances at and from the Sites;

C. Awarding compensatory damages and punitive damages to Plaintiff to the extent available by law in an amount to be proved at trial but believed to be no less than $50,000,000;

D. Awarding interests, costs, attorneys' fees and disbursements of this action; and

E. Granting Plaintiff such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: Garden City, New York
June 30, 2016

                                        JASPAN SCHLESINGER LLP
                                        *Attorneys for Plaintiff*
                                        *The Town of Hempstead*

By: s/Laurel R. Kretzing
       LAUREL R. KRETZING
       LISA A. CAIRO
       300 Garden City Plaza, 5th Floor
       Garden City, New York 11530
       (516) 746-8000

19