UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
TOWN OF HEMPSTEAD,                                  :
                                                    :
                                    Plaintiff,      :
                                                    :        MEMORANDUM & ORDER
                     -against-                      :
                                                    :        2:16-CV-3652 (ENV) (ST)
                                                    :
UNITED STATES OF AMERICA, et al.,                   :
                                                    :
                                    Defendants.     x
------------------------------------------------------------ x
VITALIANO, D.J.

Plaintiff Town of Hempstead ("Hempstead" or "the Town") brings this lawsuit against defendants the United States of America and the Department of Navy (together, the "federal defendants"), Northrup Grumman Corporation ("Northrop"), the Occidental Chemical Company ("Occidental"), and Covestro LLC and the Bayer Corporation (together, the "Covestro defendants") making claims arising under the Comprehensive Environmental Response Compensation and Liability Act ("CERLCA"), 42 U.S.C. § 9601 *et seq.*, and asserting New York common law actions sounding in nuisance, trespass, and negligence. The Town alleges that its Levittown Water District ("LWD") Wells 7A, 8A, and 13 were contaminated by groundwater emanating from the former Naval Weapons Industrial Reserve Plant; the former Northup Grumman Facility; and/or the former Hooker Chemical/Ruco Polymer Property, and seeks costs that it expended in responding to the contamination of its wells.

Presently before the Court are summary judgment motions separately filed by the federal defendants (Dkt. No. 163), Northrup (Dkt. No. 162), Occidental (Dkt. No. 180), and the Covestro defendants (Dkt No. 198). For the reasons that follow, these motions are granted in their entirety.

Background[1]

From the early 1940's to 1996, the federal defendants owned, and co-defendant Northrop and its predecessors operated, a Naval Weapons Industrial Reserve Plant located on over 100 acres of property in Bethpage, New York (the "NWIRP Site"). Fed. Defs.' Rule 56.1 Stmt., Dkt. No. 164, ¶ 1. The Site is contiguous to approximately 500 acres of property owned and operated by Northrop (the "Northrop Site"). *Id.* ¶ 2. To say that the public controversy and litigation slate underlying these sites was well-chalked by the time this lawsuit commenced would be an understatement.

During the manufacturing process at the NWIRP Site, Northrop used solvents containing volatile organic compounds ("VOCs"). Northrup Rule 56.1 Stmt., Dkt. No. 170, ¶ 4. Beginning in 1983, when the New York State Department of Environmental Conservation ("DEC") listed the NWIRP Site in the Registry of Inactive Hazardous Waste Disposal Sites, DEC has supervised investigation and remediation of the site, including off-site contamination. *Id.* ¶ 6. In 1997, Northrop installed an on-Site containment system ("ONCT") to treat and remove VOC contaminants from the groundwater. *Id.* ¶ 9. DEC subsequently issued a Record of Decision for the Operable Unit 2 groundwater plume associated with the NWIRP Site (the "OU2 ROD"), selecting the ONCT as part of its chosen remedy. *Id.* ¶¶ 9–10. The OU2 ROD assessed that the "[a]ctual or threatened release of hazardous waste constituents from this site, if not addressed by implementing the response action selected in this ROD, presents a current or potential significant

---

[1] The facts are drawn from the affidavits, exhibits, Rule 56.1 statements, and counterstatements of fact submitted by the parties. Factual disputes are noted. Where facts are disputed, "the sources for the claims made in dueling Rule 56.1 Statements" are considered directly. *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 396 (S.D.N.Y. 2015). Citations to pages of the parties' briefing refer to the Electronic Case Filing System ("ECF") pagination, except that citations to a deposition reference the internal document's pagination.

threat to public health and the environment."  Miller Decl., Ex. 2 (OU2 ROD), Dkt. No. 179-2, at 3.

The OU2 ROD also mandated the implementation of a Public Water Supply Contingency Program ("PWSCP") to address hazardous substances in the OU2 plume that might impact public water supplies.  Northrop Rule 56.1 Stmt. ¶ 11.  The PWSCP, which Northrop, the Navy, and the Town are parties to, provides for (1) groundwater modeling, which estimates the future migration of the OU2 Plume thirty years into the future; (2) outpost monitoring wells, which monitor the groundwater plume anticipated to impact public water supply wells; (3) establishment of trigger values for certain hazardous substances, which, if reached at an outpost well, would require the relevant water district to be notified; and (4) a process whereby potentially impacted water suppliers, like the Town, can negotiate with the Navy and Northrop for the design and construction of appropriate wellhead treatment or comparable alternative measures if trigger values are reached. *Id.* ¶ 16.

Hempstead operates 15 public supply wells in the Levittown Water District to the southwest of the NWIRP Site that provides potable water to customers in residential areas.  *Id.* ¶ 25.  It alleges that three of its wells—LWD Wells 7A, 8A, and 13 (the "LWD Wells")—were impacted by the chemical Freon-113 originating from commingled groundwater from the NWIRP and Northrup Sites, forcing the Town to incur millions of dollars in response costs.  *Id.* ¶ 27; Compl., Dkt. No. 1, ¶ 26.  LWD Wells 7A and 8A are situated in the same well field about 100 feet apart, and LWD Well 13 is located approximately one-half mile away from LWD Wells 7A and 8A.  Pl. Rule 56.1 Stmt., Dkt. No. 169, ¶¶ 6, 9.  Hempstead first became aware of the potential impact to the LWD Wells in July 2012, when Northrop's environmental consultant, consistent with the PWSCP, informed the Town that samples collected from outpost monitoring wells for

LWD Well 13 showed Freon-113 meeting the trigger value of 1.5 μg/l.[2] Northrup Rule 56.1 Stmt. ¶¶ 30–32.

Shortly thereafter, in April 2013, the Town retained engineering consultants Dviroka & Bartilucci Engineers & Architects, P.C. ("D&B") to determine the necessary treatment for removal of Freon-113 from the LWD Wells. *Id.* ¶¶ 33–34; Pl. Rule 56.1 Stmt. Response, Dkt. No. 168, at 7. D&B completed design reports for its chosen wellhead remedy, Packed Tower Aeration Systems ("PTAS"), in August 2014.[3] Northrup Rule 56.1 Stmt. ¶ 37. Although the PWSCP set forth a process for Hempstead to follow if it intended to seek reimbursement from the federal defendants and Northrup for its treatment of impacted wells, including negotiating the design and payment of such treatment *ex ante*, the Town unilaterally began construction of its PTAS treatment without consulting the parties and without a financial agreement in place. *Id.* ¶¶ 36–42.

Taking the next step, on April 24, 2015, a consultant for D&B sent the Navy a letter by Hempstead's fiat (the "April 2015 Letter") attaching the already Town-approved design reports for the treatment systems and stating: that construction on the Well 13 system had already commenced; that construction on the Well 7A/8A system would commence soon; and requesting payment of the Town's costs "in accordance with the PWSCSP." *Id.* ¶¶ 38, 41–42. With respect to LWD Wells 7A and 8A, the April 2015 Letter stated that the wells had not been "specifically identified in the PWSCP," but "given their proximity to the westerly boundary of the plume, it appears they have been impacted." *Id.* ¶ 43

The Navy responded to the Town's letter on June 18, 2015, requesting additional information and data supporting the letter's claim that the Freon-113 in the LWD Wells originated

---

[2] The Freon-113 detections were 1.5, 2.1, and 1.9 μg/l. Northrop Rule 56.1 Stmt. ¶ 30.

[3] A packed tower aeration system is a commonly used treatment system that reduces the presence of contaminants in water. Northrup Rule 56.1 Stmt. ¶ 98.

from the NWIRP Site and that the Freon-113 concentration necessitated wellhead treatment. Northrop Rule 56.1 Stmt. ¶¶ 46–48.  In lieu of responding to the Navy's letter, the Town filed this lawsuit on June 30, 2016, also naming as defendants Occidental and the Covestro defendants, prior owners and operators of the Hooker-Ruco Site, a 14-acre, triangular-shaped parcel of land located approximately three miles north, northeast of the LWD Wells.  *Id.* ¶¶ 50, 53; Occidental Rule 56.1 Stmt., Dkt. No. 180-24, ¶ 24; Occidental Mot., Dkt. No. 180-23, at 9.  Hempstead alleges that the "disposal and release of hazardous substances" from the Hooker-Ruco Site "caused ground water contamination which has commingled with the downgradient groundwater contamination emanating from the NWIRP/Northrup Grumman Site."  Compl. ¶ 3.  According to the Town's Water Commissioner, Occidental and the Covestro defendants were included in the lawsuit because they were identified by the Town as registered hazardous waste site owners and/or generators of hazardous wastes.  Covestro Rule 56.1 Stmt., Dkt. No. 198-15, ¶ 17.

The Hooker-Ruco Site had not flown under the radar while the NWIRP Site was the subject of environmental enforcement scrutiny. The United States Environmental Protection Agency ("EPA") placed it on the National Priorities List under CERCLA in or about 1986 and has since overseen a remedial plan for the off-site groundwater impacts from its groundwater plume (the "Hooker-Ruco Site Sub-Plume").  Occidental Rule 56.1 Stmt. ¶¶ 2–3.  In coordination with EPA and DEC, Occidental studied and selected a treatment that increased the concentration of oxygen in the Hooker-Ruco Site Sub-Plume to degrade the concentrations of volatile compounds, and later that year EPA issued a ROD approving the selected remedy (the "OU3 ROD").  *Id.* ¶¶ 8–10.  Under the OU3 ROD, residual levels of any volatile organic compound associated with the Hooker-Ruco Site Sub-Plume that have not naturally degraded from the oxygen treatment are captured and treated by a remedial system operated by Northrup under DEC oversight.  *Id.* ¶ 11.  In 2016 and

5

again in 2021, EPA concluded that the approved oxygen treatment effectively treats groundwater contamination at the Hooker-Ruco Site and that no modification to treatment is required.  *Id.* ¶¶ 17, 20.

Reasserting its aggressive litigation posture, Hempstead did not notify Occidental or the Covestro defendants prior to designing and constructing the PTAS for Wells 7A/8A and 13, nor did the Town request that EPA modify the remedy for the Hooker-Ruco Site Sub-Plume to include any treatment facilities at the LWD Wells.  *Id.* ¶¶ 32–33.  In any event, Hempstead brought claims against Occidental and the Covestro defendants, alleging that "contaminated groundwater emanating from the Hooker/Ruco site . . . is commingled with the groundwater plume emanating from the NWIRP/Northrup Grumman Site which," the Town claims, was impacting its wells.  Compl. ¶ 51.

A little more than five months after Hempstead brought suit, on December 2, 2016, the defendants separately moved to dismiss the complaint.  *See* Dkt. Nos. 51, 54, 55, 59.  On September 18, 2017, the Honorable Joseph F. Bianco, then a judge of this court and now a judge of the United States Court of Appeals for the Second Circuit, denied the motions in their entirety, except the court dismissed the Town's private nuisance claim against the Covestro defendants and the federal defendants.  *See* Dkt. No. 77.  The Court also divided the case into two phases.  *See* Dkt. No. 92.  Phase I addresses the Town's CERCLA claims, and Phase II addresses the Town's common law claims.  Discovery on the Phase II claims was stayed pending briefing on the motions for summary judgment.  *See* Dkt. No. 113.  On December 6, 2021, all defendants moved for summary judgment, seeking dismissal of the Town's Phase I CERCLA claims.  *See* Dkt. Nos. 162, 163, 180, 198.  Although no defendants sought dismissal directly on the Phase II common law claims, Northrup and Occidental argued that dismissal of the CERCLA claims would compel

dismissal of the common law claims as well, thus bringing the case to judgment and closure of the docket.

<u>Legal Standards</u>

A.    <u>Summary Judgment</u>

Summary judgment shall be granted in the absence of a genuine dispute as to any material fact and upon a showing that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  "[A] fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)).  A dispute over material facts is "genuine" where "a reasonable jury could return a verdict for the nonmoving party" based on the evidence cited.  *Anderson*, 477 U.S. at 248.  In determining whether genuine issues of fact exist, "'the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence.'"  *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 227 (2d Cir. 2024) (quoting *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019)).

Assertions of fact made in connection with a motion for summary judgment must be supported by citations "to particular parts of materials in the record" that could be presented as admissible in evidence, which may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A), (c)(2); *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 57 (2d Cir. 2012).  "Before summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden

of production even if the statement is unopposed." *Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014). With that standard in mind, the Court's job at this stage is not to try the facts but instead to merely "determine whether there are issues of fact to be tried." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995) (citing *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 244 (2d Cir. 1984)).

The movant carries the burden of demonstrating that there is no genuine dispute as to any material fact, *see Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005), and the Court will resolve all ambiguities and draw all permissible factual inferences in the light most favorable to the party opposing the motion. *See Reese v. Triborough Bridge & Tunnel Auth.*, 91 F.4th 582, 589 (2d Cir. 2024). Where the nonmoving party "will bear the burden of proof at trial," it bears the initial procedural burden at summary judgment of demonstrating that undisputed facts "establish the existence of [each] element essential to that party's case[.]" *Celotex Corp.*, 477 U.S. at 322–23. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997).

Since the controlling rule of civil procedure is the same, the standard for granting summary judgment in CERCLA cases is not different from other cases. *B.F. Goodrich Co. v. Betkoski*, 99 F.3d 505, 521 (2d Cir. 1996), *reh'g. denied*, 112 F.3d 88 (1997). At the same time, given the types of facts and issues presented in such cases, the Second Circuit has recognized that, in CERCLA cases, summary judgment "is a 'powerful legal tool' that 'can avoid lengthy and perhaps needless litigation.'" *B.F. Goodrich Co.*, 99 F.3d at 514 (quoting *U.S. v. Alcan Aluminum Corp.*, 990 F.2d 711, 720 (2d Cir. 1993)).

B.    CERCLA Statutory Scheme

CERCLA was designed to "'assur[e] that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions.'"  *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120 (2d Cir. 2010) (quoting S. Rep. No. 96–848, at 13 (1980)).  "Because it is a remedial statute, CERCLA must be construed liberally to effectuate its two primary goals:  (1) enabling [] EPA to respond efficiently and expeditiously to toxic spills, and (2) holding those parties responsible for the releases liable for the costs of the cleanup."  *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir. 1992).

Under CERCLA, "property owners are strictly liable for the hazardous materials on their property, regardless of whether or not they deposited them there."  *Niagara Mohawk*, 596 F.3d at 120.  But CERCLA leaves room for the chancellor's boot.  The statute allows property owners "to seek reimbursement of their cleanup costs . . . from certain polluters," also known as "potentially responsible parties ('PRPs')."  *Id.* (quoting 42 U.S.C. § 9607(a)).  CERCLA Section 107 "authorizes the United States, a state, or 'any other person' to seek reimbursement for all removal or remedial costs associated with the hazardous materials on the property, provided that those actions are consistent with the National Contingency Plan—the federal government's roadmap for responding to the release of hazardous substances."  *Id.* at 120–21 (citing 42 U.S.C. § 9607(a)(4)).

"A *prima facie* cause of action under CERCLA requires a plaintiff to establish:  (1) defendant fits one of the four classes of responsible parties outlined in § 9607(a); (2) the site is a facility; (3) there is a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or threatened release; and (5) the costs and response actions conform to the National Contingency Plan."  *B.F. Goodrich*, 958 F.2d at 1198 (citing *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 (2d Cir. 1985)).

<u>Discussion</u>

Putting the pre-lawsuit position-taking into a real-world context, Hempstead seeks to recover the approximately $8.4 million in response costs for its construction of the wellhead treatment system for the LWD Wells under CERCLA Section 107.  Defendants seek summary judgment, arguing that dismissal is proper because Hempstead has failed to establish two elements of its *prima facie* case:  *first*, defendants contend that releases from their respective sites—the NWIRP Site for the federal defendants and Northrup and the Hooker-Ruco Site for Occidental and the Covestro defendants—did not cause the Town to incur response costs; and *second*, even if the causation element were met, the Town's costs were neither necessary nor consistent with the National Contingency Plan.  In a foundational retort, Hempstead contends that, material facts being in dispute, summary judgment on these claims is barred.

The general principles guiding CERCLA liability determinations are well-established.  There is, of course, the critical requirement that a CERCLA plaintiff make a showing of casualty.  Plaintiffs seeking to impose liability under CERCLA must demonstrate a causal connection between a release or threatened release and its incurrence of response costs.  *See Freeman v. Glaxo Wellcome, Inc.*, 189 F.3d 160, 163 (2d Cir. 1999); *New York v. Next Millenium Realty, LLC*, 160 F. Supp. 3d 485, 504 (E.D.N.Y. 2016).[4]  But, that does not mean that the applicable liability rules are one size fits all.

---

[4] The Town incorrectly contends that CERCLA § 107(a)'s causation requirement applies only to arranger liability.  *See* Pl. Opp. to Fed. Defs. Mot. ("Pl. Fed. Opp."), Dkt. No. 167, at 18–19.  In fact, the Second Circuit has not limited the causal requirement to arranger liability because that would be contrary to the statute.  *See ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 356 (2d Cir. 1997) (requiring plaintiff to show that it "incurred costs *in response to* the release or threatened release); *see also Artesian Water Co. v. Gov't of New Castle Cty.*, 269 F. Supp. 1269, 1282 (D. Del. 1987), *aff'd* 851 F.2d 643 (3d Cir. 1988) ("CERCLA's strict liability scheme does not diminish the necessity of demonstrating a causal connection between a release or threatened release and the incurrence of costs by a section 107 plaintiff.") (citing *Shore Realty Corp.*, 759 F.2d at 1044 n. 17).

For example, CERCLA cases concerning two areas of potential contamination, a primary site and a secondary downgradient site, are referred to as "two-site" cases. *See New York v. Adamowicz*, 16 F. Supp. 3d 123, 140 (E.D.N.Y. 2014), *aff'd* 609 F. App'x 19 (2d Cir. 2015). While CERCLA is a strict liability statute—imposing liability on property owners for the hazardous materials on their property, regardless of whether they deposited them there—numerous circuit courts have determined that a different causation standard applies to plaintiffs seeking to recover in two-site cases; these plaintiffs must show a nexus between the release of contaminants on the primary site and the costs incurred on the downgradient site. *See, e.g.*, *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir. 1999) (in order to make out a *prima facie* case in a "two-site" case, a plaintiff "must establish a causal connection between the defendant's release of hazardous substances and the plaintiff's response costs incurred in cleaning them up."); *White v. County of Newberry*, 985 F.2d 168, 174–75 (4th Cir. 1993) (requiring plaintiffs to prove "a release or threatened release of a hazardous substance from the County's maintenance facility that caused the [plaintiff] to incur response costs"); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 670 (5th Cir. 1989) ("the relevant factual inquiry should focus on whether the particular hazard justified any response actions.").[5]

Although it is clear from CERCLA litigation nationally that two-site cases present the need for a different approach to causality, the Second Circuit has not embraced a singular approach in such cases as binding precedent. But multiple district courts in this circuit have, however, required

---

[5] Plaintiff is mistaken to the extent it interprets CERCLA's strict liability statutory scheme as removing a causation requirement in two-site cases. *See* Pl. Fed. Opp. at 18. Projecting strict liability onto two-site cases would open the floodgates of liability by allowing any party who discovers groundwater contamination on its land to successfully sue every party who ever released the contaminant of concern on separate land. CERCLA is meant to be construed liberally, but it cannot countenance such an absurd result. Indeed, "finding that § 9607(a) imposes strict liability does not rebut [defendants'] causation argument," as "[t]raditional tort law has often imposed strict liability while recognizing a causation defense." *Shore Realty Corp.*, 759 F.2d at 1044 n. 17.

the showing of a nexus between the contamination at the downgradient site and a release at the primary site. *See, e.g.*, *Adamowicz*, 16 F. Supp. 3d at 141 (citing *Artesian Water Co.*, 659 F. Supp. at 1283) (a plaintiff must "show that the release at the Site was a substantial factor in incurring downgradient response actions."); *DVL, Inc. v. General Elec. Co.*, 811 F. Supp. 2d 579, 597 (N.D.N.Y. 2010) (a plaintiff must "provide [] evidence of a nexus between [] defendant's waste and the contamination at the [site]"); *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F. Supp. 2d 176, 185–187 (D. Conn. 2009) (finding "[s]upport" in "the text of § 107" for the principle that "plaintiff must establish a causal connection"). Given the persuasiveness of the argument for this approach, buttressed by the favor it has found among other district courts in this Circuit, the Court elects to follow these cases and recognize that plaintiffs in two-site cases must provide evidence that their cleanup costs were caused by the release of contaminants at the primary site.[6]

Notwithstanding the causation standard used to assess them, defendants' summary judgment motions require the parties to make a showing of facts relating to the hydrology of the affected land, the creation of contaminants, actual contamination, a need to respond, and the nature of any required remedial response. The record evinces the intent of the parties to make such showings. With respect to Hempstead's chief complaint that Freon-113 contaminated its wells, the federal defendants and Northrup point out that Freon-113 is a common groundwater contaminant, and evidence indicates there are sources of Freon-113 upgradient of the LWD Wells

---

[6] With *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112 (2d Cir. 2010) as its buckler, Hempstead presses its argument against this causation standard, contending that, in *Niagara Mohawk*, the Second Circuit "applied the same standard to a two-site case as it did to one-site cases." Pl. Fed. Opp. at 22–23. But *Niagara Mohawk* is not to the contrary. While the Second Circuit in *Niagara Mohawk* stated that the plaintiff need not "prove with certainty that a [] defendant discharged the hazardous material" in order to recover, 596 F.3d at 132, the defendant was only found liable "because there [was] evidence in the record that [defendant] may have deposited hazardous materials that settled" at plaintiff's site. 596 F.3d at 135. Specifically, defendant's expert testified that hazardous materials left behind on plaintiff's property "originated at [defendant's] Plant." *Id.* Thus, just like the two-site cases from other circuits, the Second Circuit only determined liability after looking favorably on direct evidence linking the release of hazardous materials from the primary site to the ultimate cleanup costs.

and west of the NWIRP Site that the Town's consultant did not consider in designing the treatment systems. *See* Northrup Rule 56.1 Stmt. ¶¶ 64, 87–89. In fact, the Town's water commissioner admitted at his deposition that, as of June 2015, the Town had no evidence that the alleged contamination in the LWD Wells emanated from the NWIRP Site, nor could the commissioner point to a specific report or document identifying the NWIRP Site as the source of contamination at the LWD Wells. *See* Schumacher Decl. Ex. H (Reinhardt Dep. Tr.), Dkt No. 166-8, at 76:7–13; 144:18–145:4. Indeed, the Town has not offered any such admissible report or document covering the period from 2015 to the submission of the summary judgment motions. More to the point, defendants highlight evidence from the Town's own expert that the NWIRP Site is not upgradient of the LWD Wells, as the current groundwater flows *southeast* and the LWD Wells are located *southwest* of the NWIRP Site. *See* Northrup Rule 56.1 Stmt. ¶ 73. Thus, defendants assert, "[i]t does not make hydrogeological sense that the LWD Wells would even be affected by the OU2 plume." Northrup Mot., Dkt. No. 162-1, at 27.

The marshalling of these facts by defendants requires a factual response in kind to establish the existence of a material fact dispute. Instead, the Town invites the Court to speculate. In essence, Hempstead asks the court to consider why an outpost monitoring well was placed by LWD Well 13, which suggests to Hempstead that the groundwater flows from the NWIRP Site to the LWD Wells in a southwesterly direction. Pl. Fed. Opp. at 30–31. But, as the federal defendants and Northrup make clear, the outpost monitoring well for LWD 13 was installed only as a "conservative measure," as modeling showed that LWD Well 13 would not be impacted by the OU2 plume within the 30-year evaluation period. *See* Northrup Rule 56.1 Stmt. ¶ 28. Moreover, the PWSCP itself, which the Town is a party to, states that the "regional groundwater flow direction" "is migrating generally to the south/southeast." Miller Decl. Ex. 6 (PWSCP), Dkt. No.

179-7, at 8.  The Town's expert further speculates that the groundwater flow direction *may* have been different "decades ago," but notably does not even suggest that groundwater previously flowed in a southwesterly direction.  *See* Miller Decl. Ex. 27 (H2M Expert Report), Dkt. No. 179-28, at 4.  Since the current southeasterly flow of the groundwater is unchallenged, and in fact accepted by all parties, the Court agrees with Northrup and the federal defendants that the NWIRP Site could not have been the source of the Freon-113 in the LWD Wells.

The federal defendants' and Northrup's assault on causation does not end there, as their submission of plausibly uncontroverted facts and argument continue to jackhammer away at causality.  For example, their submissions zero in on the virtual absence of the compound TCE—the predominant substance associated with the NWIRP Site, *see* Fed. Defs. Rule 56.1 Stmt. ¶ 105—in the LWD Wells, reasoning that "[i]f the Freon-113 in the LWD Wells came from the TCE-characterized OU2 plume, then TCE should also be present."  Northrup Mot. at 26.  The Town's groundwater modeling expert attempts to provide the missing link by presenting evidence that Freon-113 travels faster in groundwater than TCE, *see* Northrup Rule 56.1 Smt. ¶ 92, but defendants point out certain flaws in the expert's analysis that fatally undermine its reliability.  For example, the expert admits that his opinion only applies to "pure" (*i.e.*, undissolved) forms of TCE and Freon-113, which do not exist in the OU2 plume.  *See id.* ¶ 93.  Further, the expert admitted at deposition that the two substances would travel at roughly the same rate of speed at the concentrations detected in the plume.  *Id.* ¶ 94.[7]  Also missing in his analysis is an explanation for

---

[7] The Town supports its opposition to the motions for summary judgment by filing a new expert declaration, which includes the opinion that Freon-113 travels at a faster pace in groundwater than TCE.  *See Hazlett* Decl., Dkt. No. 175 ¶¶ 20–22.  While an expert affidavit providing evidentiary details for an opinion expressed in an expert report may be considered in opposition to summary judgment, this declaration must be disregarded under the "Sham Affidavit" rule because it contradicts prior sworn testimony previously offered on behalf of the same party that the two substances would travel at the same rate of speed at the concentrations detected in the plume.  *See Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("factual allegations that might otherwise defeat a motion for summary

why LWD is the only water district allegedly affected by the OU2 plume that had only Freon-113 present in its wells. *Id.* ¶ 77. The Town therefore cannot explain how, if the NWIRP Site was indeed the source of the contamination, no TCE was found in the LWD Wells.

The Town's affirmative theories of causation, as supported by its various experts, also break down under further scrutiny. *First*, the Town's "source" expert opines that there may be a distinct Freon-113 plume at the western boundary of the OU2 plume due to "voids" in the ONCT at the Site, *id.* ¶ 74, which purportedly explains the standalone Freon-113 samples in the LWD Wells. Yet the opinion does not attempt to explain, much less factually demonstrate, what caused the contamination; instead, the opinion is only a theory about how the contamination "might" have occurred. Tellingly, the "void" theory was not accepted by DEC when presented to them. *Id.* In fact, DEC determined that the ONCT has been effective and has never concluded that the ONCT has voids that would allow contaminants to migrate from on-site to off-site. *Id.* ¶ 12. *Second*, the Town's expert on groundwater modeling performed a "capture zone" analysis, showing that the area from which the LWD Wells draw water overlaps with the OU2 plume. *Id.* ¶ 95. But the expert admitted that his "capture zone" analysis does not model contaminant fate and transport, *see id.* ¶ 96, meaning his analysis does not assist in answering the central inquiry of where the Freon-113 found in the LWD Wells originated. Nor does the "capture zone" analysis, according to the expert, rule out non-NWIRP Site sources of the Freon-113 in the LWD Wells. *Id.* ¶ 97

Given the discussed flaws in the "void" and "capture" theories of causation, Hempstead is left to rely on proximity alone: In the Town's telling, that the NWIRP Site is located near the LWD Wells and Freon-113 has been detected in both the LWD Wells and the OU2 plume is

---

judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony"). The same rule holds true when a party offers an expert declaration in opposition to a motion for summary judgment that contradicts the expert's original sworn opinion. *See Clark v. Quiros*, 693 F. Supp. 3d 254, 283 (D. Conn. 2023).

enough to create an issue of fact regarding source. But the holding in *DVL, Inc. v. General Electric Company* instructs that summary judgment is proper where, as here, plaintiff's only explanation for causation is proximity. 811 F. Supp. 2d at 597. In *DVL*, the court found the plaintiff's evidence insufficient to establish a causal link where "DVL's CERCLA claim against GE appears to rest largely on the fact that GE owns the property adjacent to the DVL Site; the soil in that property is PCB-contaminated; . . . [and] the PCBs contaminating the subject property match those used at GE's Fort Edwards Site." *DVL*, 811 F. Supp. 2d at 597–98. The *DVL* court also noted that "DVL offers no evidence that the deposits on GE's land made their way down to the DVL Site," *id.* at 599, which is similar to the Town's inability to produce evidence that deposits from defendants' land made its way to the LWD Wells. Just like the plaintiff in *DVL*, the Town needs to present more than evidence of spatial proximity to show causation and survive the motions for summary judgment. Because plaintiff fails to do so, the federal defendants and Northrup's motions for summary judgment must be granted.

Hempstead's failure to make a showing of causality essential to carrying the proof burden CERCLA § 107 demands is, if anything, starker with respect to the claims it interposes against Occidental and the Covestro defendants. To begin with, Freon-113 was not identified as part of the manufacturing process at the Hooker-Ruco Site, was not identified as a contaminant of concern for the Hooker-Ruco Site, and was not detected in the groundwater underlying or emanating from the Hooker-Ruco Site. *See* Johnson Decl. Ex. C (Johnson Report), Dkt. No. 180-22, at 5, 15, 29–31. Moreover, the primary contaminant of concern defining the Hooker-Ruco Sub-Plume, VCM, was not found in the LWD Wells, *see id.* at 6, 29, and the Town does not explain how Freon-113 could have migrated to the LWD Wells in the absence of VCM. Finally, and most damaging to the Town's theory of causation, Occidental's expert report, to which no competent retort is offered,

16

explains that the rate at which groundwater in the area generally moves is too slow for substances emanating at the Hooker-Ruco Site to have migrated the 15,000 feet to the LWD Wells in the relevant time period.  *See id.* at 20, 30; *Kalamazoo River*, 171 F.3d at 1069–1073 (affirming grant of summary judgment to defendant who demonstrated lack of necessary causal link by submitting expert evidence that contaminants from the upgradient site did not reach the downgradient one).[8]

Teetering from the start, bumped by the admission by the Town's Water Commissioner that he was unaware of any factual basis which could support a finding that the Hooker-Ruco Site may have been the source of the Freon-113 found in the LWD Wells, *see* Covestro defendants Rule 56.1 Stmt. ¶¶ 15–16, Hempstead argues that Freon-113 was "used and likely discharged at the Hooker-Ruco Site and likely migrated off-site and commingled with the OU2 plume," and the commingled plume impacted its wells.  *See* Pl. Opp. to Occidental Mot. ("Pl. Occ. Opp."), Dkt. No. 180-26, at 18, 22–28.  Struggling to find something beyond sheer speculation to support its argument, the Town rests on three disparate and obscure references to Freon-113 dating back almost 50 years, but these references—which at most show that Freon-113 existed at the Hooker-Ruco Site—fail to create a dispute about any material fact, even when considered collectively with the Town's other evidence.

The first reference is hidden in a 1977 "Raw Materials Requirement" list, which included Freon-113 as one of the chemicals purchased for use at the Hooker-Ruco Site for the calendar year 1974.  But Hempstead offers no proof as to what, if any, use Occidental or the Covestro defendants made of the substance at the Site, nor does it offer any evidence to distance itself from a document that answers the question:  a 1979 Occidental interoffice memorandum showing that Freon-113

---

[8] Hempstead disputes the distance, as calculated by the defense expert, between the Hooker-Ruco Site and the Wells, *see* Pl. Rule 56.1 Response, Dkt. No. 180-28, ¶ 24, but the expert report, which, on this point, is not plausibly disputed, makes clear that the rate at which groundwater moves was too slow to even travel the lesser distance claimed by the Town.  *See* Johnson Report at 20.

was neither used, manufactured, nor discharged at the Hooker-Ruco Site.  *See* McDonald Decl. Ex. A (1979 Memo), Dkt. No. 180-158 at 3.  The Town next offers groundwater and soil sampling from the Hooker-Ruco Site in 1989 and 1990 which purports to show the inclusion of Freon-113, but the record reveals that these samples were rejected because the "blanks"—*i.e.*, separate samples used as control groups—also revealed the presence of Freon-113, indicating test invalidity and neutering its evidentiary relevance.  *See* Johnson Decl., Ex. C at 16.  In its final effort to connect the Hooker-Ruco Site to its response costs, the Town points to an appendix to the 2005 Final Design Report that Occidental submitted to EPA for approval of its oxygen treatment system; the appendix contains a list of chemical compounds previously detected in soils and groundwater "at and in the vicinity of the Hooker-Ruco Site," including Freon-113.  *See* Fisher Decl. Ex. 119 (Final Design Report), Dkt. No. 198-144, at 20.  However, this reference does not help the Town in the way it supposes, as "in the vicinity" suggests that not every compound identified in the appendix was actually found on the Hooker-Ruco Site itself.  Aside from evidence showing that on one occasion Occidental ordered Freon-113 in connection with the Site and that Freon-113 was found to exist somewhere on land in the vicinity of the Site, Hempstead's claim that Freon-113 was used at the Hooker-Ruco Site essentially rests on speculation contravened by compelling evidence offered by Occidental that Freon-113 was never used in any of the processes conducted at the Site.

Although the Court does not believe that the evidence proffered by the Town creates a disputed fact on whether Freon-113 existed at the Hooker-Ruco Site, assuming for purposes of argument that it does, it does not advance the Town's cause on Occidental's and the Covestro defendants' motions for summary judgment.  Indeed, any dispute on this point is immaterial.  As discussed above, even assuming the presence of Freon-113 contamination at the Hooker-Ruco

18

Site, the Town offers no explanation for:  (1) how the Freon-113 traveled to the Town's wells without the predominant contaminant of concern in the Hooker-Ruco sub-plume; and (2) how Freon-113 could have migrated from the Hooker-Ruco Site to the Town's Wells given the rate at which groundwater travels and the distance and time involved.  Thus, Occidental's and the Covestro defendants' motions for summary judgment must be, and are, granted.

Equally fatal as the failure to establish causation, and an alternative basis for the Court's entry of summary judgment for defendants, Hempstead's CERCLA claims fail to pass muster under the National Contingency Plan (the "NCP").  As explained in *Town of Oyster Bay v. Northrup Grumman Systems Corporation*, a private party plaintiff must establish that its response costs were both "necessary" and incurred consistent with the NCP to sustain a CERCLA § 107 claim.  No. 05-cv-1945, 2009 WL 10691086, at *19, 23–24 (E.D.N.Y. May 14, 2009) (citing 42 U.S.C. § 9607(a)(4)(B)) (granting summary judgment on CERCLA claims because the plaintiff town, just like Hempstead here, did not follow the NCP); *see* also *B.F. Goodrich Co.*, 952 F.2d at 1198.  A "private party response action will be considered consistent with the NCP if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements" of the NCP.  40 C.F.R. § 300.700(c)(3)(i).  This is so while recognizing that "[i]mmaterial or insubstantial deviations" from the NCP do not render a response action inconsistent with the NCP.   40 C.F.R. § 300.700(c)(4).

Where the presence of contamination is acknowledged and response action is taken, a first step adjudication is required to determine whether the response action was a removal action or a remedial action.   "Removal actions are clean-up or removal measures taken to respond to immediate threats to public health and safety," whereas "[r]emedial actions are generally actions designed to permanently remediate hazardous waste."  *New York v. Next Millenium Realty, LLC*,

732 F.3d 117, 124–25 (2d Cir. 2013) (citing 42 U.S.C. §§ 9601(24)–(25)).  The distinction can be dispositive since the NCP requirements for remedial actions are more stringent than those for removal actions.  *See Carson Harbor Village, Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1155 (C.D. Cal. 2003) ("Because of the exigency inherent in removal actions, the statutory requirements for NCP compliance relative to such actions are somewhat more relaxed."); *Public Service Co. of Colo. v. Gates Rubber Co.*, 175 F.3d 1177, 1183 (10th Cir. 1999).  But a ruling on whether Hempstead's response is a removal or remedial action is unnecessary, as it cannot even create a material dispute of fact to disprove defendants' showing that the response actions the Town took do not substantially comply with the more relaxed standards for NCP compliance for removal actions.

*First*, the Town did not provide sufficient opportunity for public comment, which "must be provided regardless of whether a removal or remedial action is performed."  *VME Americas, Inc. v. Hein-Werner Corp.*, 946 F. Supp. 683, 690 (E.D. Wi. 1996) (granting summary judgment where plaintiff seeking reimbursement for costs incurred did not comply with public notice and comment requirements of the NCP).[9]  As a general matter, the NCP states that "[p]rivate parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action."  40 C.F.R. § 300.700(c)(6).  With regard specifically to "community relations in removal actions," the NCP provides that the Town "shall inform the

---

[9] In opposition, plaintiff cites *Versatile Metals, Inc. v. Union Corp.*, 693 F. Supp. 1563, 1577 (E.D. Pa. 1988) and *Carlyle Piermont Corp. v. Federal Paper Bd. Co.*, 742 F. Supp. 814, 818 (S.D.N.Y. 1990) for the propositions that "[r]emoval actions are not subject to the lengthy procedural requirements of the NCP" and the "requirements for a removal action do not include provisions for appropriate comment."  *See* Pl. Occ. Opp. at 45.  However, both *Versatile Metals* and *Carlyle* evaluated recovery actions that pre-dated the substantial revision to the NCP that took effect on April 9, 1990.  Not only are the two versions of the NCP accompanied by different compliance standards, *see VME America*, 946 F. Supp. at 689, but the new version, unlike the older version, requires Town's seeking to recover for removal actions to comply with the NCP, including its public participation requirements.  *Compare* 40 C.F.R. § 300.415(n)(1), *with* 40 C.F.R. § 300.65.

community of actions taken, respond to inquiries, and provide information concerning the release." 40 C.F.R. § 300.415(n)(1); 40 C.F.R. § 300.700(c)(5)(vi).  Here, the Town admitted that it did not provide the public with any notice or opportunity to comment on the proposed treatment system prior to the selection of its remedy and the commencement of construction on one of the treatment systems, *see* Northrop 56.1 Stmt. ¶¶ 44, 139–142, which is fatal to its claim.  *See VME Americas*, 946 F. Supp. at 690.  Nor does the Town's July 2015 "letter to the LWD community about the proposed well site improvements," Pl. Occ. Opp. at 57–58, bring it into substantial compliance with the NCP, as the letter was sent *after* the Town had begun construction on its treatment plan for LWD Well 13 and *after* it approved design reports for the other wells.[10]

Furthermore, the Town's motion papers are barren of any evidence to create even the slightest doubt that it ignored its obligations under the NCP by not studying the cost-effectiveness of its plan and incurring unnecessary expenses in its implementation.  To begin with, there is no evidence that the Town engaged in a remedial investigation/feasibility study ("RI/FS") required for remedial actions, or even the less formal Engineering Evaluation/Cost Analysis ("EE/CA") required for long-term removal actions.  *See* 40 C.F.R. § 300.415(b)(4) ("Whenever a planning period of at least six months exists before on-site activities must be initiated, and the lead agency determines, based on a site evaluation, that a removal action is appropriate:  (i) The lead agency shall conduct an engineering evaluation/cost analysis (EE/CA) or its equivalent.").  An EE/CA considers the nature and extent of site contamination and any threats to human health or the environment, as well as analyzes the effectiveness, implementability, and cost alternatives that may satisfy the objectives of the removal action prior to recommending a course of action.  *See*

---

[10] Tellingly, the July 2015 letter did not even reference the work commenced on LWD Well 13, *see* Fisher Decl. Ex. 22 (July 2015 Letter), Dkt. No. 171-22, so plaintiff's argument that the letter satisfied the public participation requirement of the NCP fails on its face.

Miller Decl. Ex. 10 (Herman Expert Report), Dkt. No. 179-11, at 23.  The Town's hired engineer prepared design reports, but those reports did not include a risk evaluation, alternatives analysis, or any other of the hallmarks of an EE/CA to ensure that a chosen remedy is cost effective.

Compounding its mistake in not performing a pre-implementation cost analysis, the record reveals that Hempstead incurred unnecessary expenses by overdesigning its remedy even though CERCLA only allows a plaintiff to recover the "necessary costs of response . . . consistent with the national contingency plan." 42 U.S.C. § 9607(a)(1–4)(B).  For example, D&B designed the treatment systems to treat 420 µg/l of TCE even though no TCE had been found in the LWD Wells. *See* Northrup Rule 56.1 Stmt. ¶¶ 70–71, 103.  No Town representative or expert has been able to explain why it chose this aggressive threshold, and Northrup's treatment design expert determined that the 420 µg/l design criteria led to unnecessary costs,  *id.* ¶ 136, all of which is uncontroverted. Thus, the costs are unrecoverable as a matter of law because they were incurred merely to respond to a "theoretical threat," *Regional Airport Authority of Louisville v. LFG, LLC*, 460 F.3d 697, 705–06 (6th Cir. 2006), and used for a design that was "unnecessary to address the hazardous substances at issue." *Waste Management of Alameda County, Inc. v. East Bay Regional Park District*, 135 F. Supp. 2d 1071, 1099 (N.D. Cal. 2001); *see also Town of Oyster Bay*, 2009 WL 10691086, at *21–22.[11]

The Town's shortcomings in its purported compliance with the statutory requirements for NCP-qualified removal actions are laid bare by its admitted failure to understand those requirements beforehand.  Straightforwardly, Hempstead's witnesses, including the Commissioner

---

[11] Hempstead also admitted that it installed the PTAS on LWD Well 7A/8A in two treatment towers due to "aesthetic" considerations unrelated to any "health based reason or regulatory reasons," Northrup Rule 56.1 Stmt. ¶¶ 117–118, even though it would have been less expensive and equally effective to use one tower.  *Id.* ¶¶ 120–122. But there is "no support for any theory basing CERCLA liability on aesthetics:  the concern of CERCLA is to correct a hazardous situation, not an aesthetic blight."  *Milbut v. Hi-Score Plant Food Co.*, No. 91-2008, 1992 WL 396774, at *5 n.5 (E.D. Pa. Dec. 24, 1992).

of the Water Department and the engineer who designed the treatment systems, testified that they were not aware of the NCP when planning the treatment. *See* Northrop Rule 56.1 Stmt. ¶¶ 128, 131. Likewise, no one in the Town bore responsibility for ensuring that the Town complied with the NCP in connection with its treatment. *Id.* ¶ 129. The Town thus cannot show that it substantially complied with the NCP where it was unaware of the NCP's requirements, failed to engage the public's participation, and did not perform an analysis to ensure cost effectiveness. With these gaps in the Town's understanding of CERCLA compliance requirements, it is not surprising that there are no material facts in dispute.

In a tacit acknowledgement that it did not substantially comply with the letter of the NCP, the Town suggests a handful of reasons why it should be exempted from compliance. Each fails to persuade. *First*, plaintiff boldly requests a categorical exemption from NCP compliance for cleanups of drinking wells, arguing that "the requirements of the NCP do not squarely fit" cases that "involve[] the protection of the drinking water provided to the public and not the remediation of a hazardous waste site." Pl. Occ. Opp. at 41. The Town does not point to any such exemption in the NCP, nor could it: courts routinely review NCP compliance in CERCLA cases involving public water suppliers. *See, e.g.*, *Town of Halfmoon v. General Elec. Co.*, 105 F. Supp. 3d 202 (N.D.N.Y. 2015); *S. Farmingdale Water Dist. v. Coltec Indus. Inc.*, No. 05-cv-1566, 2007 WL 9718900 (E.D.N.Y. Oct. 17, 2007).

Nor do the Town's discussions with the Nassau County Department of Health ("NCDOH") remove it from the strictures of the NCP. While a private party may establish compliance with the NCP by showing that its response was conducted under the monitoring, and with the ultimate approval, of a state's environmental agency, *see Niagara Mohawk Power Corp.*, 596 F.3d at 137, DEC did not monitor or approve the Town's plans. The Town claims that "the NYSDOH and

NCDOH, with input from []DEC, had oversight and approval of the design and implementation of the wellhead treatment systems," Pl. Occ. Opp. at 57, but the record paints a different picture. The only evidence of DEC's involvement that the Town points to is that DEC provided the Town with certain documents upon request in November 2013, and the Town later provided DEC with its treatment design reports in August 2014. *See* Merklin Decl., Dkt. No. 193 ¶¶ 29, 52. Notably absent is any evidence that the Town discussed its proposed wellhead treatment system with DEC, let alone that DEC provided input, evaluated, discussed, or approved the proposal. These circumstances are a far cry from the "monitoring" and "ultimate approval" by DEC that would obviate the need for NCP compliance. *See Innis Arden Golf Club*, 629 F. Supp. 2d at 181 n.3 (granting summary judgment because, *inter alia*, a "remediation project" that "proceeded with minimal state involvement other than periodic updates" did not satisfy the NCP compliance obligation).

Finally, assuming without deciding that there is merit in the Town's argument that its compliance with the PWSCP would satisfy its requirements under the NCP, *see* Pl. Occ. Opp. at 47–55, it fails to shield Hempstead from the grant of summary judgment to defendants on their motions. Simply put, even if the argument is valid, the supporting facts are missing since Hempstead is unable to show that its actions conformed with the PWSCP. At the outset, the Town's Water Commissioner testified that he could not identify any steps in the PWSCP that the Town complied with. *See* Northrup Rule 56.1 Stmt. ¶ 23. Further, the PWSCP provides that "once the trigger value(s) has been reached and confirmed," "pre-design discussions/negotiations will commence between NAVY/Northrop Grumman and the potentially affected water district(s) so that funding for wellhead treatment or comparable alternative measure can be negotiated and provided to the water district(s)." PWSCP at 11. But the record shows that no pre-design

discussions and negotiations took place, nor was a financial agreement in place prior to the Town beginning its work.    After Northrup's consultant informed the Town of the trigger value exceedances on July 12, 2012, the Town did not commence negotiations with Northrup or the federal defendants.  Northrup Rule 56.1 Stmt. ¶¶ 30–32, 39.  Rather, the Town opted to design and begin construction on its treatment systems, making no contact with the federal defendants or Northrup until three years later, when it requested post-design, post-construction funding.  *Id.* ¶ 39.  Contrary to the Town's suggestions, *see* Pl. Fed. Opp. at 56, there is nothing in the PWSCP to suggest that it was the federal defendants' or Northrup's burden to initiate negotiations or that the Town's compliance was optional.  These last-ditch defenses, in sum, do not save the Town from judgment.[12]

Defendants, as one might imagine, seek to leverage the facts found undisputed in defeating Hempstead's CERCLA claims to similarly defeat its claims interposed under New York common law.  Northrup argues that each of the Town's common law claims is fatally hobbled by the finding already made that plaintiff has not raised a genuine issue of material fact regarding the source of the Freon-113 in LWD Wells 7A, 8A, or 13, nullifying Hempstead's ability to prove an element essential to all of those claims, namely that chemical constituents leaving either the NWIRP Site or Hooker-Ruco Site contaminated the LWD Wells.  *See* Northrup Mot. at 36–38.[13]  In opposition, the Town argued the only issues properly before the Court are issues related to the Town's Phase I CERCLA claims, at least as scheduled for briefing.

---

[12] The Town also asserts a claim for declaratory judgment under Section 113(g)(2), 42 U.S.C. § 9613(g)(2) against all defendants.  Because the Town has not demonstrated a valid claim under Section 107 against any defendant, defendants are also entitled to a judgment as a matter of law on the declaratory relief claim.  *See Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 92 (2d Cir. 2000); *Town of Oyster Bay*, 2009 WL 10691086, at *24.

[13] Occidental, by contrast, argues that in the absence of viable CERCLA claims, the Court lacks jurisdiction under CERCLA § 113(h) over the common law claims.  *See* Occidental Mot. 33–34.  Because the Court dismisses the common law claims for the reasons outlined in Northrup's motion, the Court need not address Occidental's jurisdictional argument.

Although, as the Town correctly notes, the Phase II claims are not formally presented for consideration on these motions, the rules of procedure do not demand that form be the enemy of substance.  It is true, as defendants say, that after discovery and full litigation of the common essential issue on these motions, the Town was unable to even raise a genuine disputed material fact about, much less prove causation, by connecting the Freon-113 in the LWD Wells to either the NWIRP Site or Hooker-Ruco Site.  A showing of causation is, plainly, required to make out each of the common law claims advanced by the Town.  *See*, *e.g.*, *Suffolk Cnty. Water Auth. v. Dow Chem. Co.*, 958 N.Y.S.2d 649 (N.Y. Sup. Ct. 2010) (to make out the common law claims, like, for example, public nuisance, a plaintiff must demonstrate that there was an unreasonable interference with the rights of the public, intentionally caused by the defendant's conduct); *Fetter v. DeCamp*, 195 A.D.2d 771, 773–74 (N.Y. App. Div. 3d Dep't 1993) (granting summary judgment for the defendant in a case involving negligence for pollution of underground waters where the plaintiff did not provide evidence establishing contamination of the well or its source). Upon a search of the record in this case, the Town's failures on its CERCLA claims forecloses it from making the required showing of causation.  In this posture, judicial economy will best be served by dismissing these claims now.  *See ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 360 (2d Cir. 1997) (holding that, because plaintiff could not establish that the defendants contaminated the site in its CERCLA action, its negligence claims were also properly dismissed). Accordingly, defendants are entitled to and are awarded judgment on Hempstead's claims brought under New York common law.

Conclusion

For the foregoing reasons, defendants' motions for summary judgment are granted in full. The Clerk of Court is directed to enter judgment accordingly and to close this case.

So Ordered.

Dated:  Brooklyn, New York
         February 16, 2025

                                        */s/ Eric N. Vitaliano*
                                        ERIC N. VITALIANO
                                        United States District Judge